Filed 5/30/24  P. v. Guerrero CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B325771 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. PA090387 |
| MANUEL GUERRERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri G. Merritt, Judge. Affirmed as modified.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Manuel Guerrero of one count of second degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). With respect to count 1, the jury found that Guerrero personally and intentionally discharged a firearm, causing great bodily injury and death. (§ 12022.53, subds. (b)–(d).) Guerrero raises seven claims of error on appeal: (1) the court erred in denying his pretrial motions under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); (2) Guerrero's right to legal autonomy was violated when a continuance was granted over his objection; (3) the court erred in failing to instruct the jury on transferred intent sua sponte; (4) the evidence was insufficient to support a murder conviction; (5) the court erred in denying Guerrero's request for a mistrial following prosecutorial misconduct; (6) the court erred in admitting jail calls; and (7) the court erred in imposing the consecutive 25-year-to-life firearm enhancement.

We modify the judgment to reflect that the section 667, subdivision (a)(1) enhancement is stricken and affirm the judgment as modified.

## FACTUAL BACKGROUND

### 1. Stipulated Facts

On February 3, 2018, a shooting occurred in Pacoima, California. Andrew Stewart was shot multiple times. Law enforcement received a call concerning the shooting at 2:06 a.m. and reported to the scene, where they properly recovered

---

[1] All undesignated statutory references are to the Penal Code.

16 expended .45 caliber cartridge casings, 10 expended nine-millimeter cartridge casings, keys on a lanyard, and several projectiles that could not be definitively identified.

On February 3, 2018, during an investigation at another residential address in Pacoima, Officer Raul Martinez recovered a .45 caliber semi-automatic pistol and a magazine containing live rounds. DNA testing later performed on the magazine inside revealed that the gun contained Guerrero's DNA.

On February 6, 2018, Dr. Okey Ukpo performed an autopsy on Stewart and recovered three fired bullets from his left lower chest, spine, and small bowel.

A Los Angeles Police Department criminalist tested the bullets and casings recovered by law enforcement personnel during the investigation on February 3, 2018. All of the spent .45 caliber cartridge casings recovered from the scene were fired by the pistol recovered from Guerrero. Every fired bullet recovered from the scene, including from Stewart's body, was fired by the pistol recovered from Guerrero, with the exception of two items for which a definitive determination could not be made. All of the nine-millimeter caliber casings recovered at the scene were fired by a single unrecovered firearm.

A Los Angeles county medical examiner coroner analyst conducted a gunshot residue (GSR) test using a kit obtained by coroner's office personnel who responded to the scene of the crime on February 3, 2018. The GSR testing revealed that Stewart's right and left hand had "many characteristic particles of gunshot residue." The conclusion in the report was that Stewart may have discharged a firearm, been in the vicinity of the discharge of a firearm, or touched a surface with residue on it.

## 2.	The Crime Scene

Officer Aaron Green was on duty the morning of February 3, 2018, and received a radio call that approximately ten shots had been fired and a man had been heard screaming. When Officer Green arrived at the scene, the driveway of a residential address, he observed a man lying face down on the pavement.[2] The victim had his hands slightly underneath him and his face was straight down in the concrete, which indicated to Officer Green that he was dead. Officer Green had other officers clear people away to attempt to protect the integrity of the scene. He observed expended casings, including both .45 caliber and nine-millimeter casings.

When the Fire Department arrived, it moved the victim's body, which had been partially underneath a car, and turned his body over. Officer Green recognized the victim as Andrew Stewart. He was declared deceased.

Officer Green testified that the distance between Stewart's body and the nine-millimeter casings was approximately 20 feet. He did not observe any trail of blood indicating that Stewart had been shot near the casings but subsequently moved. Officer Green observed a clear plastic bag clutched in the victim's left hand that appeared to contain some kind of narcotic. He concluded that Stewart was likely holding the bag at the time he was shot.

Officer Green walked the crime scene to look for evidence and ensure that no one had been injured by a stray round. He did not observe any rounds in the front part of the house behind the

---

[2] A diagram of the crime scene showed that the victim's body was located between vehicles parked in the driveway.

driveway or in the fence that ran along the side of the driveway. He saw nothing indicating that bullets had been fired in the direction of the house or fence. However, there were bullet impacts in a white sedan parked in the driveway. He observed blood on the asphalt near the white sedan, which Stewart was found next to and partially under. He did not observe any other blood at the scene.

Officer Green had been a peace officer for 15 years at the time of the shooting and was previously in the United States Army for 21 years. He had utilized handguns during the entirety of his career and had fired thousands of rounds. In his experience, semi-automatic handguns eject spent casings to the right and slightly behind the position of the firearm, usually two to three feet.

Detective Richard Moakley was a supervising detective for the Los Angeles Police Department and was assigned as a homicide detective to the shooting. He processed the scene and identified, documented, and recovered evidence. Detective Moakley searched the driveway, the front yard, and the front porch of the house for expended casings and other evidence. He also examined the cars in the driveway for bullet impacts, as well as a couple of neighboring houses. He also searched the other side of the street. Detective Moakley documented all the evidence he located and prepared several diagrams denoting the location of the evidence, including a diagram indicating where the casings of different calibers were found. Detective Moakley located a lanyard with keys underneath where he believed Stewart's body was before it was moved by the Fire Department, exposing the blood and the lanyard. The lanyard was identified as belonging to Stewart.

Detective Moakley testified that he had fired firearms for over 30 years and that the majority were semi-automatic handguns. He testified that semi-automatic handguns generally eject spent casings in a right rear direction. Based on the location of the nine-millimeter casings, he suspected that the shooter of the unrecovered gun was standing on the sidewalk. In the absence of impacts in any other direction, he believed that the shooter might have shot in an east direction into the street or down the sidewalk. No nine-millimeter "projectiles, fragments, or slugs" were located, including in the direction of the house or any nearby houses.

The white sedan in the driveway, which was owned by Stewart, had five bullet impacts. The sedan was moved to a police garage where a forensic team placed rods in the car to provide a visual representation of the bullet's trajectory. Detective Moakley was present when they were placed in Stewart's vehicle. The rods showed that the bullets traveled from the driver's side to the passenger's side of the sedan.

When the coroner arrived at the scene, Detective Moakley observed the wounds sustained by Stewart. He testified that the majority of the wounds were to Stewart's backside. Based on the wounds, the casings, and the bullet impacts to the car, Detective Moakley determined that Stewart was standing between the car and the shooter.

Detective Rene January, a detective with the Homicide Bureau, was the designated investigative officer for the matter. Detective January was questioned regarding grainy security video from a house across the street from the shooting and agreed that, for some period slightly before and after the shooting,

unidentifiable individuals appeared to be coming and going from the general location of a nearby house.

**3.     Forensic Analyses**

Debra Gibson, a criminalist at the Los Angeles Department of Medical Examiner, testified that an individual might get GSR on their hands by discharging a firearm, being near one when it goes off, or by coming into contact with a surface that has residue on it. She stated that the presence of GSR on one's body is not proof that one has fired a gun and that there is no way of telling how residue got on someone's hands from a GSR test. She agreed that, where an individual was shot at least 14 times from a range of about 10 feet, she would expect GSR to be on that person. She explained that, when a firearm is discharged, the majority of the material comes out in the muzzle direction. She would therefore expect to see GSR on surfaces in front of where a gun was fired 14 times. Gibson explained that residue does not travel in a line but comes out as a cloud and then quickly cools and condenses and lands on surfaces.

Dr. Odey Ukpo, a medical examiner and forensic pathologist, conducted Stewart's autopsy. Dr. Ukpo testified that the entry wounds of the bullets were predominantly to the back of Stewart's body. He discovered a total of nine entry wounds. One of the bullets severed Stewart's spinal cord and another went through his aorta. Stewart's cause of death was gunshot wounds.

Alan Perez, a criminalist with the Forensic Science Division of the Los Angeles Police Department, testified regarding the bullet path analysis he performed on Stewart's sedan in February 2018. This entailed searching the car for impacts, documenting the location and direction of the impacts, and attempting to retrieve projectiles from the impacts. Perez

used rods to visually represent the pathway of projectiles through the vehicle. Certain impacts were between approximately one-foot and three-feet off the ground.

**4.     Guerrero's Arrest**

Guerrero's uncle, Luis Guerrero, Sr., testified that at the time of the shooting, he was living in Pacoima with his wife and children, including his son, Luis Guerrero, Jr., and his daughter-in-law, Brenda Bejarano.[3] At around 2:00 a.m. on February 3, 2018, Luis, Sr. was woken by knocking. When he got up, he saw his son and nephew in the living room. Guerrero stated that he had been shot and appeared scared. Luis, Sr. observed a lot of blood on Guerrero and asked if he wanted to see a doctor. Guerrero said no but Luis, Sr. told Bejarano to call an ambulance anyway. Guerrero opened the front door twice and, when he observed the ambulance, closed the door, and started towards the garage, where Bejarano, Luis, Jr., and their children stayed. Bejarano tried to stop him and Luis, Sr. grabbed him from the back in a bear hug. Guerrero tried to break free. A gun fell out while Luis, Sr. held Guerrero in the bear hug. Law enforcement then arrived. Luis, Sr. observed officers putting on gloves and gestured toward the gun, which the officers then recovered. Luis, Sr. testified that the gun was not there previously and did not belong to anyone in the house.

Bejarano testified that she was woken by a loud knocking on the door to the garage. She opened the door and observed Guerrero, who stated that he had been shot and asked for help.

_____

[3] Because Luis Guerrero, Sr. and Luis Guerrero, Jr. share a last name with Guerrero, we refer to them as Luis, Sr. and Luis, Jr. to avoid confusion. No disrespect is intended.

Guerrero was breathing hard. Guerrero ran through the door to the garage and then went through the door to the main living area. Bejarano was alarmed and followed to try and help. She told Guerrero that she was going to call 911. When the police arrived, Guerrero tried to exit through the garage. Bejarano got in front of him and blocked him from entering the garage, as her children were there. Bejarano told law enforcement that Guerrero was trying to leave the house when they were trying to get help for him.

Officer Raul Martinez testified that he arrived at Luis, Sr.'s house between 2:50 and 2:55 a.m. on February 3, 2018. He observed Guerrero being held by Luis, Sr. Officer Martinez attempted to get Guerrero to exit the house to receive treatment for his gunshot wounds, but a family member asked him to enter the house. Luis, Sr. gestured to the gun and told Officer Martinez that it had been in Guerrero's waistband. Initially, Guerrero stated " 'They shot me,' " which Officer Martinez assumed meant someone else, but Guerrero later stated, " 'Why did you do that, Louie?' kind of blaming his family members, that they had shot him." Officer Martinez asked Guerrero whether he had been on Weidner Street, where the shooting took place. Guerrero stated that he had been there. Officer Martinez recovered the gun, along with a clip, and detained Guerrero.

Officer Martinez later went to the hospital where Guerrero was being treated. He observed that Guerrero was injured in his shoulder area. He photographed the injuries but was not able to photograph Guerrero's back as he was in the middle of being treated.

## 5.      Jail Calls

Several undated jail calls between Guerrero and unidentified persons were played at trial.

In one of the calls, Guerrero informed an unidentified female speaker that he had asked a third party whether "the guy that died . . . ha[d] a gun on him" and that the person was not sure. In another, Guerrero told a male speaker: "Shit fucking, it looks good, dog. It doesn't look too bad for me and shit . . . . [H]e said it looks more like self-defense and it looks more like, um, uh, like manslaughter . . . . He goes, yeah, because, um, there was a bunch of shell casings found around the guy that died." Guerrero stated that he had told the unidentified man that he was shot with a shotgun and that the man said that no shotgun shells were located. Guerrero told the male caller that once "all this shit starts playing out later that I was shot front and back, then, you know, it starts looking a little like, ambush and shit, you know?" During a different call, he again stated that he had been told it might be manslaughter or self-defense because they found nine-millimeter gun casings. Guerrero informed the female caller that "they're not sure . . . if the dude that died, if he had a gun on him" but they would check.

## PROCEDURAL BACKGROUND

A second amended information charged Guerrero with one count of murder (§ 187, subd. (a); count 1) and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). In connection with count 1, it was further alleged that Guerrero personally discharged a firearm (§ 12022.53, subd. (b)–(d)). With respect to both counts, it was alleged that Guerrero had one prior felony conviction (§ 667, subd. (a)(1)), served four prior prison

10

terms (§ 667.5, subd. (b)), and had one prior strike under the Three Strikes law (§§ 667, subd. (d); 1170.12, subd. (b)). Guerrero pleaded not guilty and denied the allegations.

A jury found Guerrero guilty of second degree murder and possession of a firearm by a felon. It also found the gun allegations to be true. Guerrero admitted one prior strike allegation.

In November 2022, the court sentenced Guerrero to 15 years to life for second degree murder, which was doubled as a second strike, and 25 years to life for the section 12022.53, subdivision (d) enhancement, but stayed the five-year enhancement under section 667, subdivision (a). The court imposed a sentence of one year four months for possession of a firearm by a felon. He was given credit for 1,733 actual days of presentence custody. Guerrero timely appealed.

## DISCUSSION[4]

Guerrero contends that the court committed reversible error on both counts of conviction in denying one or more of his three pretrial *Marsden* motions. He argues that his counsel sought continuances over his speedy-trial objections and that this demonstrates the existence of an irreconcilable conflict. He also asserts that the court improperly relied on its familiarity with

---

[4] "An appellate court is not required to address all of the parties' respective arguments, discuss every case or fact relied upon by the parties, distinguish an opinion just because a party claims it is apposite, or express every ground for rejecting every contention advanced by every party." (*People v. Garcia* (2002) 97 Cal.App.4th 847, 853.) The parties submitted over 300 pages of briefing on appeal. We address the most pertinent arguments and authorities in this opinion.

Guerrero's attorney outside of the instant proceedings in ruling on his motions. Guerrero contends that the court also committed reversible error on both counts because it allowed his counsel to disregard his personal objective of obtaining a speedy trial and thus denied Guerrero his right to legal autonomy.

Guerrero further argues that the court prejudicially erred in failing to sua sponte instruct the jury on transferred intent for purposes of perfect and imperfect self-defense. He asserts that there was evidence to support that Guerrero may have intended to fire at a third person in self-defense but accidentally struck Stewart, but, without this instruction, the jury had no basis to apply the defenses to the shooting of Stewart. Guerrero contends that there was insufficient evidence to support that he was the initial aggressor and thus guilty of murder. Guerrero further argues that the court prejudicially erred in denying his motion for a mistrial after the prosecutor committed misconduct by speaking in the voice of the victim in his closing argument.

Additionally, Guerrero asserts that the court prejudicially erred in receiving evidence of his state of mind through jail calls in which Guerrero referred to what he was told about his case. He argues that the calls were irrelevant and failed to provide any insight into his state of mind with respect to the killing of Stewart or, in the alternative, the risk of unfair prejudice substantially outweighed any probative value under Evidence Code section 352. Finally, he contends that the court erred in imposing the 25-year-to-life firearm enhancement, either because it lacked discretion to do so under section 1385 or because it abused its discretion in imposing it under the circumstances of this case.

12

The Attorney General disputes each of these arguments. Although Guerrero did not raise the point, the Attorney General contends that the court erred in stating that it was staying the section 667, subdivision (a)(1) enhancement, rather than striking it, and argues that we should order the court to prepare an amended abstract of judgment reflecting that the enhancement was stricken.

1. **The court did not abuse its discretion in denying Guerrero's *Marsden* motions.**

    1.1. **Additional Background**

    The preliminary hearing took place March 7, 2019. Guerrero pleaded not guilty on March 21, 2019, and, following an amended information, again on June 13, 2019. Guerrero personally agreed to waive time on four occasions between July and November of 2019. In February of 2020, the parties agreed on a trial in early May and Guerrero again waived time. Beginning in March 2020, the court continued the matter five times due to the Covid-19 pandemic. Guerrero refused to appear at a pre-trial hearing on July 21, 2020, and the matter was again continued.[5] At a pretrial conference held on August 19, 2020, the court advised Guerrero that it was still unable to hold jury trials as a result of the Covid-19 pandemic. At the following hearing, on August 31, 2020, Guerrero's counsel—Anthony Rayburn—stated that it was Guerrero's position "that the continuances imposed from above on an ongoing basis are objected to" and that he and

---

[5] At a subsequent pre-trial hearing, Guerrero's counsel represented that Guerrero had not refused to come but had never been called for a remote appearance.

13

Guerrero were prepared for trial and wished to proceed as soon as possible. The court acknowledged Guerrero's frustration and stated that he was not the only person who had expressed frustration at the continuances but explained that the Covid-19 pandemic was ongoing and that "we also have to ensure, and our Chief Justice in the state of California is trying to ensure, that we balance your rights to a speedy trial and the safety of everyone who comes in here . . . ."

On November 3, 2020, Rayburn informed the court that there was "still a fair amount of work that needs to be done." Guerrero personally consented to a continuance. Guerrero again personally waived time on February 23, 2021, and April 29, 2021.

### 1.1.1. First *Marsden* Motion

On July 20, 2021, Guerrero made his first *Marsden* motion on the grounds that he felt he and his attorney were "not on the same page" because his attorney was seeking to waive time while he was not. He also expressed frustration because he had not received a plea offer even though he had agreed to prior continuances for the purpose of facilitating one.

The court gave Rayburn an opportunity to address these concerns. Rayburn explained that "a while back" there had been an offer from the prosecution of "something in the mid-twenty range" and that Guerrero's counteroffer had been "something like an assault for six to eight years." Thus, the parties were "nowhere close to a meeting of the minds at that point." More recently, he and Guerrero had discussed possible sentences and Rayburn had agreed to make a proposal to the People of 11 years. Rayburn had not received a response to that proposal until the morning of the hearing, when he was informed that it was rejected and that there would be no counterproposal.

14

Rayburn stated that a new prosecutor was going to be assigned to the case and he had a good working relationship with that prosecutor. He believed it was possible that plea discussions could reopen. Guerrero replied that he felt that he had been in jail for too long and that no progress had been made. He expressed that his concern now was getting the case to trial rather than resolving it.

The court stated for the record that Guerrero had "one of the most tenacious, hard-working, smart attorneys out there," though it acknowledged: "You're frustrated. I get that. This pandemic has turned the world upside down. It's made things go over. And I understand your position, and I'm not here to tell you what you have to do . . . . I'm not here to tell you what you have to do as far as the trial, waiving time, any of that. I'm not. What I do know is this: Mr. Rayburn does not control who the D.A. on the case is. It sounds like this is now D.A. number three."

Guerrero expressed concerns about the time that the new district attorney would need to get up to speed on the case. The court replied: "I can't speak to that . . . . What I propose is this: It sounds to me like, one, I don't think there's any question Mr. Rayburn is working well above that which is expected of an attorney in his position. [¶] I also don't think there's been a complete breakdown in your guys' relationship. There's been fits and starts and frustrations. I'm not going to say I understand because that's not fair for me to say. I'm not sitting where you're sitting." The court also stated that it appeared that Rayburn was trying to resolve the matter. It reiterated that it was denying the motion because it did not believe there had been a breakdown in the relationship and because it did "not believe that Mr. Rayburn

has anywhere near, let alone fallen below the level of professionalism that's required of a defense attorney."

Guerrero stated that there had been "a few arguments back and forth," and the court replied that such arguments are "going to happen." When Guerrero expressed concern that Rayburn might take the motion personally and not do the job to the best of his ability, the court stated that it understood Rayburn to have thick skin and allowed him to address the issue. Rayburn stated that he did not view Guerrero as a difficult client, that he had worked hard to get discovery to Guerrero, and that he liked working with Guerrero and would continue to work hard for him. Guerrero stated again: "I don't want to waive time anymore. I want to go to trial." The court stated: "That is a very different issue. We can talk about that once the prosecutor's here." It denied the *Marsden* motion without prejudice and ordered the record sealed.

Following the *Marsden* portion of the hearing, Guerrero personally agreed to waive time. On September 23 and December 8, 2021, Guerrero also waived time.

### 1.1.2. Second *Marsden* Motion

On February 10, 2022, Rayburn informed the court that Guerrero had "expressed an interest this morning in no uncertain terms of proceeding without [Rayburn] as an attorney," which he understood to be a *Marsden* motion. Guerrero agreed and stated that he had wanted a new attorney for the prior six months. Guerrero told the court that Rayburn did not remember key things to the case, such as putting a body attachment on someone, which was subsequently called off. The court stated that the individual was the prosecution's witness and had died. Guerrero further stated that Rayburn was failing to keep him

16

informed on the facts of the case, had failed to reach a resolution with the prosecution, wanted additional time to locate a witness even though "they've had four years to find this witness," and wanted to use the prosecution's GSR expert because his expert would not be available in the coming weeks.

The court stated that Rayburn "went to the mat" with the prior district attorney on the case to get discovery to Guerrero. It also observed that Rayburn's failure to obtain a plea deal did not reflect poorly on him, as "it takes two to tango." The court also reiterated that "Mr. Rayburn has a sterling reputation; has for decades," although it acknowledged that he could nevertheless have slipped up.

Rayburn clarified that he would have raised any *Marsden* requests to the court had he been informed of them during prior appearances. He also explained that he had been attempting to get a meeting with the supervisor of the Gang Unit for some time and was finally able to give a presentation on why the case was suitable for resolution the prior week. He was informed the morning of the hearing that there would be no counteroffer. Rayburn also informed the court that the case had changed due to the emergence of a witness. He had been attempting to get the witness's address or information concerning her location since he learned of the witness but had been told for the prior year and a half that the prosecution was unaware of her location. Rayburn's understanding from the current district attorney was that the witness's whereabouts remained unknown, but they agreed to interview the witness together if she was located. He also discussed using the prosecution's ballistics expert for the strategic purpose of moving the case along, as it was his opinion that it would be better to proceed to trial before the prosecution

17

could locate the witness, who could present problems for Guerrero's case.

The court stated that it believed that Rayburn was providing "excellent representation" and that it did not believe that the working relationship between Rayburn and Guerrero had broken down so far that it would be better for Guerrero to start over with another attorney. It indicated an intention to deny the *Marsden* motion but gave Guerrero another opportunity to speak. He expressed concerns about using the prosecution's expert and inquired how long it would take for Rayburn's expert to become available. The court indicated that they could break to determine when the expert would become available. Guerrero again stated that he wanted a change of counsel. The court informed him that, even if it were inclined to grant the request, it would have the effect of further delaying his trial as the new attorney would need time to get up to speed. The court stated: "I am respectful of the frustration. Two years of the entire planet's life have been on hold because of the pandemic. That is out of all of our control." It denied the *Marsden* motion without prejudice. After a recess, at which Rayburn and Guerrero discussed "witness issues," Rayburn requested a continuance and Guerrero personally waived his statutory speedy trial rights.

On March 29, 2022, Guerrero personally waived time for one day.

### 1.1.3.  Third *Marsden* Motion

The third and final *Marsden* hearing took place April 5, 2022. Prior to the hearing, Rayburn sought an additional continuance to allow DNA testing of the casings located at the scene, which he believed was crucial to the defense. Guerrero objected that he had four years to get the casings tested. The

court inquired whether Rayburn felt that the testing was essential to the case and he stated that he did. He explained that he did not anticipate any percipient witnesses at trial and that a DNA link between the casings that did not come from Guerrero's gun and Stewart would support Guerrero's claim that he acted in self-defense. He had not realized that testing had not been completed until a meet and confer with the district attorney, who was the third assigned to the case. The court acknowledged Guerrero's frustration and that, "[t]hrough no fault of [his] own, through the pandemic and craziness of this world the last couple of years, [Guerrero], like many people, had to wait longer for [his] day in court." However, it expressed the view that "it would be a greater detriment to [Guerrero] to deny Mr. Rayburn his request than allow [him] to proceed without this evidence," which could potentially establish a viable case for self-defense. Guerrero asserted that he was receiving ineffective assistance of counsel and the court cleared the courtroom to hold a *Marsden* hearing.

During the hearing, Guerrero again expressed frustration with the delays and his feeling that Rayburn was "not doing his job." Guerrero repeatedly talked over the court when it attempted to make its record. The court again denied the motion. Following the *Marsden* portion of the hearing, the court stated for the record that it was finding good cause for a continuance of the trial.

On May 19, 2022, Guerrero again personally waived time until July 18, 2022. The record indicates that Guerrero refused to appear at the next hearing set for June 30. At a hearing held on July 5, the district attorney indicated that it had several witnesses who would not be available until August 29, 2022. The district attorney also presented its final plea offer of 32 years to

19

life on the record, which would remain open until the subsequent pretrial hearing in August. Rayburn stipulated to the requested continuance, but Guerrero did not. The court found good cause to grant the continuance.

### 1.2. Applicable Law

Guerrero contends that he and Rayburn had an irreconcilable conflict with respect to the assertion of his speedy trial rights. We therefore examine the law governing *Marsden* motions as well as the law relevant to his assertion of his speedy trial rights.

### 1.2.1. *Marsden*

As explained in *People v. Streeter* (2012) 54 Cal.4th 205, 230: " 'When a defendant seeks substitution of appointed counsel pursuant to [*Marsden*], "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.] 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." ' [Citation.] [¶] 'We review the denial of a *Marsden* motion for abuse of discretion.' [Citation.] 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' "

20

"Both the United States Constitution and the California Constitution guarantee criminal defendants the right to the assistance of counsel unburdened by any conflicts of interest. [Citation.] Essentially, a claim of conflict of interest constitutes a form of ineffective assistance of counsel. [Citations.] In order to demonstrate a violation of the federal and state constitutions based on a conflict of interest, a defendant must show that his or her counsel was burdened by an 'actual' conflict of interest—one that in fact adversely affected counsel's performance. [Citation.] When determining whether counsel's performance was ' "adversely affected" ' by the purported conflict under this standard, we consider whether ' "counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict." ' [Citation.]" (*People v. Perez* (2018) 4 Cal.5th 421, 435.) " ' "Conflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person *or by his own interests.*' " ' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 673, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

A court is "entitled to accept counsel's explanation and [is] not obliged to inquire, sua sponte, into the actual efficacy of counsel's efforts." (*People v. Webster* (1991) 54 Cal.3d 411, 436; see also *People v. Abilez* (2007) 41 Cal.4th 472, 488 ["Counsel had adequate explanations for all of defendant's complaints, and ' "[t]o the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' " ' "].)

### 1.2.2. Speedy Trial Right

" 'The right to a speedy trial is a fundamental right guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. [Citation.] The purpose of the speedy trial right is "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." [Citations.]' " (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1122.)

Our high court has previously observed that "[t]he right to a speedy trial is undeniably 'as fundamental as any of the rights secured by the Sixth Amendment' [citation] and . . . counsel may not waive this *constitutional* right over his client's objections." (*Townsend v. Superior Court* (1975) 15 Cal.3d 774, 781.) However, it recognized that " '[e]xcept where representation by counsel is so ineffective that it can be described as a "farce and a sham" [citations], an attorney may ordinarily waive his client's rights.' " (*Id.* at p. 781.) It further observed that "the *statutory* right to be tried within 60 days (§ 1382, subd. 2) cannot properly be termed 'fundamental' . . . and therefore beyond counsel's primary control." (*Ibid.*)

Our high court has also explained: "Decisions of this court and the Courts of Appeal have expressly recognized the tension between two rights guaranteed to every criminal defendant, the right to a speedy trial conferred by both the federal and state Constitutions and implemented through the time requirements in statutory provisions such as sections 686, 1381, and 1382, on the one hand, and the right to the effective assistance of counsel guaranteed by the Sixth Amendment, on the other hand.

[Citations.] In these cases, the tension arose when the defendant's desire to invoke the right to speedy trial by refusing to waive time came into conflict with defense counsel's request for a continuance. . . . Implicit in these decisions . . . is the notion that the inherent tension between the right to a speedy trial and the right to competent, adequately prepared counsel is not, in itself, an impermissible infringement on the rights of the accused, including the right to a fair trial." (*People v. Frye* (1998) 18 Cal.4th 894, 938–939, disapproved of another ground by *People v. Doolin*, *supra*, 45 Cal.4th 390.)

In other words, counsel's consent to a continuance over a defendant's objection is not tantamount to a waiver of the federal constitutional speedy trial right. That right cannot be "quantified into a specified number of days or months." (*Barker v. Wingo* (1972) 407 U.S. 514, 523.) Rather, a Sixth Amendment speedy trial claim is determined by balancing all relevant factors, particularly the length and reason for the delay, whether the defendant asserted the right, and prejudice to the defendant. (*Id.* at p. 530.) Federal courts have held that continuances obtained over the objection of the defendant do not necessarily infringe on the federal constitutional speedy trial right. In *United States v. Tanh Huu Lam* (9th Cir. 2001) 251 F.3d 852, 857–858, the Ninth Circuit Court of Appeals assessed the merits of a claimed violation of the Sixth Amendment speedy trial right under the criteria set forth in *Barker* and concluded that continuances requested by defense counsel with good cause accrued to the defendant and weighed "heavily against" a finding that the defendant's federal constitutional speedy trial rights had been violated, even where the defendant requested a speedy trial. "[A]bsent a showing of deficient performance on counsel's part,"

the Ninth Circuit "decline[d] to permit a defendant's interest in a speedy trial to override his attorney's legitimate assessment of the complexity of a case and his corresponding need to prepare." (*Id.* at p. 858.)

In California, section 1382 "is one of the principal provisions implementing criminal defendant's statutory right to a speedy trial. The statute provides that, in a felony case, the court shall dismiss the action when a defendant is not brought to trial within 60 days of his or her arraignment on an indictment or information, unless (1) the defendant enters a general waiver of the 60-day trial requirement, (2) the defendant requests or consents (expressly or impliedly) to the setting of a trial date beyond the 60-day period (in which case the defendant shall be brought to trial on the date set for trial or within 10 days thereafter), or (3) 'good cause' is shown." (*People v. Sutton* (2010) 48 Cal.4th 533, 545.)

Under section 1382, "[i]f counsel seeks reasonable time to prepare a defendant's case, and the delay is for defendant's benefit, a continuance over the defendant's objection is justified." (*People v. Lomax* (2010) 49 Cal.4th 530, 556; *Barsamyan v. Appellate Division of Superior Court* (2008) 44 Cal.4th 960, 969 ["Defense counsel, as part of his or her control of the procedural aspects of a trial, ordinarily has authority to waive the statutory speedy trial rights of his or her client, even over the client's objection, as long as counsel is acting competently in the client's best interest."].) However, " 'appointed defense counsel lacks authority to waive his or her client's statutory speedy trial rights when the client personally objects to a continuance and the sole reason for the continuance is defense counsel's obligation to another client.' " (*Lomax*, at p. 553; *Barsamyan*, at p. 969

24

["defense counsel lacks authority to waive his or her client's statutory speedy trial rights when the client personally objects to a continuance and the sole reason for the continuance is defense counsel's obligation to another client"].)

### 1.3. Analysis

Although the circumstances may have presented a conflict between Guerrero's speedy trial rights and his constitutional right to competent and adequately prepared counsel, Guerrero cites no pertinent authority supporting his position that this constituted an irreconcilable conflict of interest that rendered Rayburn unable to render effective assistance.[6] The law summarized above establishes that such conflicts can be reconciled in favor of the attorney seeking additional time to prepare the defendant's case. Guerrero also cites no cases supporting his assertion that every *Marsden* motion in which a defendant expresses an opposition to a continuance requires the court to undertake a *Barker* analysis or transforms the motion into a statutory motion to dismiss.

The circumstances here are distinguishable from *People v. Carter* (2022) 86 Cal.App.5th 739 (review granted Mar. 1, 2023, S278262), on which Guerrero relies.[7] In *Carter*, the defendant

---

[6] Guerrero relies in part on cases concerning a dispute between counsel over whether to enter a plea of not guilty by reason of insanity. (See *People v. Henning* (2009) 178 Cal.App.4th 388, 404; *People v. Loya* (2016) 1 Cal.App.5th 932, 945.) As we discuss below, whether to plead guilty is a fundamental objective of a defendant's representation and not a decision that an attorney can make over the defendant's objection and is therefore distinguishable from consent to a continuance.

[7] *People v. Carter*, *supra*, 86 Cal.App.5th 739 involved a defendant subject to a commitment petition under the Sexually Violent Predator

sought dismissal because of delays in his trial and separately sought replacement of counsel via a *Marsden* motion. (*Id.* at p. 745.) The trial court first denied the *Marsden* motion because it found that defendant's current counsel had acted diligently in moving the case to trial. (*Id.* at p. 748.) Counsel explained that she could not ethically file the motion to dismiss because she "would have to say that she was not fulfilling her ethical duty to pursue trial in a timely manner." (*Id.* at pp. 748–749.) The trial court permitted the defendant to file the motion in propria persona, but he rejected the opportunity because he felt unable to capably represent himself. (*Id.* at p. 749.) On appeal, the court unanimously agreed that the trial court did not abuse its discretion in denying the *Marsden* motion where the defendant's " 'main' and 'only complaint' was delay in bringing his case to trial," but the defendant conceded that his attorney had been diligent. (*Id.* at p. 750; see also *id.* at p. 760 (conc. & dis. opn. of Robie, J.) ["trial court did not err in denying his *Marsden* motion"].) However, the majority and concurring and dissenting opinions disagreed as to whether the motion to dismiss should also be treated as a "quasi-*Marsden* motion." (*Id.* at p. 750; see also *id.* at p. 760 (conc. & dis. opn. of Robie, J.). The majority believed it was a quasi-*Marsden* motion "because it created a conflict between the public defender, who did not believe she and the public defender's office had failed to diligently pursue a

---

Act (Welf. & Inst. Code, § 6600 et seq.). " 'Although the Sixth Amendment right to counsel does not apply to such civil commitment proceedings, a defendant has a due process right to the effective assistance of counsel, and thus the right to make *Marsden* motions to discharge his or her appointed counsel.' [Citation.]" (*Id.* at pp. 749–750.)

timely trial on his behalf, and defendant, who maintained he had been denied a speedy trial while represented by the public defender's office." (*Id.* at p. 750.) It observed that the decision to file a motion to dismiss was ultimately a tactical decision and that tactical disagreements do not constitute irreconcilable conflicts. (*Id.* at p. 752.) It held that the court did not abuse its discretion in denying the quasi-*Marsden* motion. (*Id.* at p. 754.)

After this matter was submitted, the Supreme Court issued its opinion in *People v. Carter* (May 20, 2024, S278262) __ Cal.5th __ [2024 Cal. LEXIS 2735], in which it conditionally reversed the Court of Appeal and remanded for further proceedings. The court concluded that "[h]aving both motions before it, the trial court should have considered Carter's *Marsden* motion in the context of his proposed motion to dismiss. In other words, the court should not have simply determined whether [his attorney] had 'done her job' up to that point but should have asked whether a conflict of interest would have prevented [her] from effectively investigating and potentially litigating Carter's motion to dismiss." (*Id.* at pp. *15–*16.) It observed that "[f]ocusing on this relationship was essential to adequately evaluating the *Marsden* motion," as the inquiry requires both consideration of past performance and consideration of whether the attorney could provide effective representation in the future. (*Id.* at p.*16.) The Supreme Court further explained that "[r]egardless of whether [Carter's counsel] had 'done her job,' other factors may have been relevant to Carter's motion to dismiss[,]" including Carter's attempt to show an institutional breakdown. (*Ibid.*) It was unclear on the record before it whether delay caused by Carter's previous attorney had been "a 'tactic' or whether Carter 'had previously assented to' it." (*Id.* at p.*19.) The

27

court also noted that, with the exception of " 'pro se motions regarding representation, including requests for new counsel,' " " '[m]otions and briefs of parties represented by counsel must be filed by such counsel.' [Citation.]" (*Id.* at pp.*19–*20.) "Carter's motion to dismiss, which was distinct from his *Marsden* motion, was not a request for new counsel. Indeed, in response to the trial court's instruction that Carter would have to proceed on his own, Carter made clear that he wanted the assistance of counsel in preparing and filing his motion to dismiss." (*Id.* at p.*20.)

The Supreme Court therefore "conclude[d] that the trial court abused its discretion in denying Carter's *Marsden* motion without an adequate inquiry and further erred in denying Carter the assistance of counsel in determining whether to file a motion to dismiss." (*People v. Carter*, *supra*, __ Cal.5th __ [2024 Cal. LEXIS 2735, at p.*20].) It reversed the judgment and remanded with instructions that the trial court conduct a *Marsden* hearing to determine whether a conflict of interest would prevent the public defender's office from litigating the motion to dismiss. "If so, then the *Marsden* motion should be granted, and an attorney not affiliated with that office should be appointed to evaluate Carter's motion to dismiss." (*Id.* at p.*21.)

As there is no indication in the record that Guerrero sought, or asked Rayburn to seek, dismissal of the case on speedy trial grounds and his attorney never declined to represent him in bringing such a motion, the Supreme Court's admonition that *Marsden* motions and motions to dismiss, when brought together, should be considered together, has no apparent application here. Rayburn never suggested that a conflict of interest prevented him from representing Guerrero in any motion Guerrero wished to bring, nor did the trial court fail to consider whether such a claim

28

was true in denying Guerrero's *Marsden* motions. Moreover, with the exception of the delay occasioned by the Covid-19 pandemic, the record here is clear that Guerrero " 'previously assented to' " every continuance. (*People v. Carter*, *supra*, __ Cal.5th __ [2024 Cal. LEXIS 2735, at p.\*9.) We decline to extend the reasoning of *Carter* beyond its facts.

Further, unlike the defendant in *People v. Gonzalez* (2021) 12 Cal.5th 367, Guerrero never stated that he would choose to proceed without an attorney rather than waive additional time. *Gonzalez* did not involve a *Marsden* motion and did not conclude that there was an irreconcilable conflict between the defendant and his counsel. Rather, in *Gonzalez*, the defendant argued that the trial court had abused its discretion in *denying* his attorney's request for a second continuance of trial, which his attorney made over his objection. (*Id.* at pp. 386–387.) Defense counsel requested four additional months to complete her investigation but failed to provide any time estimates or explanations of what exculpatory evidence she hoped to obtain. (*Id.* at p. 386.) The defendant made it clear that he would represent himself if the continuance was granted. (*Id.* at pp. 387, 388.) On the record before it, the reviewing court "[could not] conclude that the trial court abused its discretion in attempting to balance the right to effective counsel versus the asserted right to a speedy trial by granting one continuance over defendant's objection, but not two." (*Id.* at p. 388.) Its conclusion that the denial of a continuance was *not* an abuse of discretion does not compel the conclusion that the trial court's denial of *Marsden* motions here *was* an abuse of discretion.

Guerrero argues that the court's statement at the July 2021 hearing that the issue of whether Guerrero would waive

29

time again was "very different" to the *Marsden* question was erroneous because the issues were intertwined. We disagree. "*Marsden* error" does not occur "where complaints of counsel's inadequacy involve tactical disagreements." (*People v. Dickey* (2005) 35 Cal.4th 884, 922.) A conflict between Guerrero and Rayburn as to whether a continuance was appropriate could be resolved by a ruling of the court as to whether good cause existed. (See *People v. Lomax, supra,* 49 Cal.4th at p. 556.) Although a disagreement concerning a continuance could potentially rise to the level of an irreconcilable conflict, there is no evidence in the record that such a conflict existed in this case. Rather, Guerrero repeatedly and voluntarily waived his statutory right to a speedy trial, including on the dates of the first and second *Marsden* hearings and after the third hearing.

"We do not suggest that counsel possesses carte blanche under any and all conditions to postpone his client's trial indefinitely. Counsel's power in this regard is not unlimited. '[A] criminal defendant may not be deprived of a speedy trial because . . . the defense . . . is lazy or indifferent' . . . . Nor may counsel effectively waive his client's rights where the record reveals that the latter was the victim of inadequate representation." (*Townsend v. Superior Court, supra,* 15 Cal.3d at p. 784.) Considering that Rayburn had the authority to consent to continuances even over Guerrero's objection, it was appropriate for the court to focus on whether Rayburn had provided adequate representation in the context of the issues raised by Guerrero.[8] If

---

[8] Further, "[i]t is the very nature of a *Marsden* motion, at *whatever* stage it is made, that the trial court must determine whether counsel has been providing competent representation. Whenever the motion is made, the inquiry is forward-looking in the sense that counsel would

he failed to do so, his desire for continuances despite Guerrero's opposition may have constituted a conflict of interest.

During the July 2021 hearing, Guerrero expressed frustration about the fact that no progress had been made in obtaining a plea deal, despite the fact that he had agreed to continuances for that purpose. Rayburn addressed this concern: he explained that he had made an offer to the district attorney and that the deal was ultimately rejected by the district attorney after some delay on her office's end. However, Rayburn believed he might be able to reach a favorable resolution with the new district attorney taking over the case, with whom he was familiar. Rayburn stated that he did not consider Guerrero to be a difficult client and that he enjoyed working with him. After this explanation, the court concluded that Rayburn was not providing ineffective representation. Guerrero personally waived time.[9]

---

be substituted in order to provide effective assistance in the *future*. But the decision must always be based on what has happened in the *past*." (*People v. Smith* (1993) 6 Cal.4th 684, 695.) Thus, the court's focus on Rayburn's past performance, rather than on whether Guerrero would subsequently object to a waiver of time, was justified.

[9] Guerrero contends that he only waived time to "mak[e] the best of a bad situation" following the court's purportedly erroneous conclusion that the issue of whether a further continuance was appropriate was separate from the *Marsden* question. Guerrero cites *People v. Calio* (1986) 42 Cal.3d 639, 643, in which the Supreme Court observed: "Even without an express reservation of the right to appeal, defendant's admissions would not be binding if induced by judicial error: 'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.' [Citation.]" As discussed, we perceive no error in the court's focus on Rayburn's performance in the absence of any indicia

31

Similarly, at the February 2022 *Marsden* hearing, Guerrero raised four complaints in addition to delays in reaching trial: (1) his perception that Rayburn was forgetting key aspects of the case; (2) Rayburn's desire for additional time to locate a witness; (3) the unavailability of Rayburn's GSR expert; and (4) Rayburn's failure to obtain a plea deal.[10] Rayburn addressed these issues at the hearing. He did not express any unwillingness to represent Guerrero to the best of his ability if Guerrero wished to proceed to trial. Rather, Rayburn stated that the choice was Guerrero's and offered alternatives that would allow the case to proceed to trial, such as the use of the prosecution's GSR expert. The court concluded that Rayburn was providing "excellent representation." After having an opportunity to discuss the issues raised in that hearing with Rayburn, Guerrero again personally waived time.

With respect to the final *Marsden* hearing, the record supports that Rayburn's failure to secure DNA testing of the casings located at the scene was the result of an oversight. However, Rayburn explained to the court's satisfaction why this evidence was important to Guerrero's defense and why a continuance over his objection was appropriate. The court's

that the disagreement regarding continuances had become irreconcilable. Moreover, nothing in the court's statement induced Guerrero to agree to a continuance. Rather, the court indicated that he was free to oppose a waiver of time once the prosecutor was back in the courtroom. Thus, Guerrero's failure to object was not prudent mitigation of the adverse effects of the court's ruling. (See *People v. Eilers* (1991) 231 Cal.App.3d 288, 297.)

[10] The lattermost complaint indicates that Guerrero continued to seek a favorable plea deal despite his prior claim that he was no longer interested in a plea. This undermines any claim that his sole interest was in proceeding to trial.

conclusion that this disagreement did not signify an irreconcilable conflict of interest was not an abuse of discretion. In a case in which there were no percipient witnesses, physical evidence linking Stewart to the nine-millimeter casings could have persuaded the jury that Stewart was the aggressor. Moreover, considering that Guerrero's primary complaint at the final *Marsden* hearing was delay, the conclusion that the appointment of new counsel would only cause further delay was reasonable.

Guerrero does not meaningfully challenge the court's *Marsden* rulings apart from his assertion that the disagreements between Guerrero and Rayburn regarding whether a continuance was appropriate or not constituted an irreconcilable conflict. "[A] party attacking the judgment, or any part of it, must affirmatively demonstrate prejudicial error." (*People v. Garza* (2005) 35 Cal.4th 866, 881.) We perceive no abuse of discretion in the court's conclusion that Rayburn was providing adequate representation at each of the hearings. Accordingly, we conclude that his requests for continuances did not indicate that his loyalty to Guerrero was threatened or that he could not provide adequate representation in the future.

In addition to challenging the *Marsden* rulings on the grounds of an irreconcilable conflict, Guerrero contends that the court impermissibly relied on its knowledge of facts outside the record in denying the motions. At the *Marsden* hearings, the court observed that it had long been familiar with Rayburn and knew him to be a hard-working and intelligent person with a "sterling reputation." However, the court also expressly acknowledged that his past performance did not mean he was necessarily providing adequate representation in this case. At

each hearing, the court asked Guerrero what his concerns were and asked Rayburn to address those concerns. The court also relied on its observations of proceedings before it, including Rayburn's extensive efforts to provide Guerrero with discovery that the prosecution did not want him to have.

We agree with the Attorney General that the circumstances here are distinguishable from those present in *People v. Hill* (1983) 148 Cal.App.3d 744, on which Guerrero relies. In *Hill*, the trial court did not question counsel on the subject of the defendant's complaints on the record, but instead "investigate[d] [the] claims of dissatisfaction through ex parte, off-the-record discussions" with present and past counsel for the defendant. (*Id.* at p. 754.) It alluded to these ex parte discussions on the record and indicated a belief that current and former attorneys for the defendant were "extremely capable, experienced counsel." (*Ibid.*) On appeal, the court observed that "*Marsden* and its progeny emphatically hold, a court may not go outside the record of the immediate prosecution and base the disposition of defendant's request upon observations of the attorney on other occasions." (*Id.* at p. 755.) It further explained that "[f]ailure to inquire adequately into a defendant's complaints results 'in a silent record making intelligent appellate review of defendant's charges impossible.' [Citation.]" (*Ibid.*) Because the conversations with the attorneys were not part of the record, it concluded that *Marsden* error occurred. Unlike in *Hill*, the court gave Guerrero the opportunity to voice his concerns and invited Rayburn to address those concerns on the record. Our review of the record confirms the hearings were sufficient to satisfy Guerrero's due process rights.

Citing *People v. Martinez* (2009) 47 Cal.4th 399, Guerrero contends that *Hill* requires a finding of *Marsden* error whenever a court refers to its familiarity with counsel outside of the proceeding before it. In the footnote cited by Guerrero, our high court explained that "the trial court's actions ordinarily must be reviewed on the basis of the evidence before it at the time it made its decision concerning such a complaint" and "cannot be reviewed on the basis of the subsequent conduct of counsel." (*Id.* at p. 423, fn. 5.) It noted that records of professional discipline imposed on the defendant's attorney in that case were irrelevant to the *Marsden* motion before the trial court. (*Ibid.*) The court's statements do not establish that *any* reference to *past* performance by defense counsel means that a court has committed *Marsden* error, an issue it did not consider. (See *Melchor Investment Co. v. Rolm Systems* (1992) 3 Cal.App.4th 587, 591 [" 'Opinions are not authority for issues they do not consider. [Citations.]' [Citation.]"].)

2. **Guerrero fails to establish that his Sixth Amendment right to legal autonomy was violated.**

   2.1. **Applicable Law**

Relying on *McCoy v. Louisiana* (2018) 584 U.S. 414 (*McCoy*), Guerrero argues that his counsel's requests for continuances overrode his rights under the Sixth Amendment to choose the objective of his defense. In *McCoy*, defense counsel decided the best approach to avoid a death sentence for the defendant was to concede his guilt to the alleged murders. The defendant expressly objected to this strategy before the trial began and objected to defense counsel's concession of guilt throughout the trial. (*Id.* at pp. 418–420.) The United States

35

Supreme Court framed the issue before it as "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." (*Id.* at p. 420.) In holding that defense counsel's actions violated the defendant's Sixth Amendment rights, the court explained that a defendant does not surrender all control of his or her defense when deciding to receive the assistance of counsel and that "[a]utonomy to decide that the objective of the defense is to assert innocence" belongs to the defendant. (*Id.* at pp. 421–422.) Therefore, "[w]hen a client expressly asserts that the objective of '*his* defen[s]e' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id.* at p. 423.)

The *McCoy* opinion cited with approval a number of state cases holding that counsel may not unilaterally pursue a strategy of "concession of the defendant's commission of criminal acts and pursuit of diminished capacity, mental illness, or lack of premeditation defenses." (*McCoy*, *supra*, 584 U.S. at pp. 425–426.) These cases, as the high court described them, "were not strategic disputes about whether to concede an element of a charged offense, [citation]; they were intractable disagreements about the fundamental objective of the defendant's representation." (*Id.* at p. 426.) As the *McCoy* court explained: "Such an admission blocks the defendant's right to make the fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." (*Id.* at p. 428.) The court further held the error was structural and remanded the matter for a new trial. (*Ibid.*)

Federal courts have construed *McCoy* narrowly. (See, e.g., *United States v. Rosemond* (2d Cir. 2020) 958 F.3d 111, 123 ["[W]e read *McCoy* as limited to a defendant preventing his attorney from admitting he is guilty of the crime with which he is charged."].)

### 2.2. Analysis

As the Attorney General points out, even after *Marsden* motions premised on his concern about the lack of progress towards trial, Guerrero personally waived time at his first two *Marsden* hearings and on several occasions thereafter. It was only at the third and final *Marsden* hearing that Guerrero stated that he would not agree to a continuance and that any continuance was over his objection. A personal waiver of time constitutes a formal and knowing relinquishment of the federal constitutional speedy trial right. (*People v. Seaton* (2001) 26 Cal.4th 598, 633–634.) Thus, we focus our analysis on the third *Marsden* hearing.

Although it is indisputable that "[f]or certain fundamental rights, the defendant must personally make an informed waiver" (*New York v. Hill* (2000) 528 U.S. 110, 114), neither *McCoy* nor any other decision cited by Guerrero persuades us that counsel's request for a continuance made over the objection of a defendant, yet for his or her benefit, runs afoul of the right established in *McCoy*. *McCoy* is limited to fundamental objectives. As discussed above, the federal speedy trial right must be balanced against the defendant's Sixth Amendment right to effective assistance of counsel. That balancing permits continuances over the defendant's objection. (See *United States v. Tanh Huu Lam*, *supra*, 251 F.3d at pp. 857–858.)

Even if *McCoy* could apply in this context, the court did not simply accept counsel's request for additional time over Guerrero's objection but found that good cause existed for the continuance. Moreover, defense counsel in *McCoy* conceded guilt "over the defendant's intransigent and unambiguous objection." (*McCoy*, *supra*, 584 U.S. at p. 420.) Here, Guerrero agreed to trial continuances on multiple occasions, both before and after the April 5 hearing. Thus, the record does not indicate that a speedy trial was his sole objective, at the expense of adequate representation, or that he was intransigent in his insistence upon this right. For these reasons, we decline to hold that *McCoy* applies under the circumstances of this case.

We note that the Ninth Circuit Court of Appeals has also declined to apply *McCoy* in the manner urged by Guerrero. In *United States v. Macias* (9th Cir. 2020) 811 Fed.Appx. 1000, 1002, the defendant argued "that only he had the authority to waive time for purposes of a constitutionally speedy trial" and "rest[ed] his argument on an analogy to [*McCoy*]." The Ninth Circuit concluded that "counsel's trial management authority applies to scheduling matters, including agreements to delay trial [citation]" and that the analogy to *McCoy* was therefore inapposite. (*Ibid.*)

3. **The court did not have a duty to instruct the jury on transferred intent sua sponte.**

   3.1. **Additional Background**

In his opening arguments, counsel for defendant argued: "On February 3rd, 2018, in the very early hours of the morning, for reasons that may never be explained, Mr. Stewart, an acquaintance of Mr. Guerrero, fired nine shots at Mr. Guerrero.

Mr. Guerrero reacted to that by removing the gun he had and killing Mr. Stewart. Mr. Guerrero's gun is responsible for the death of Mr. Stewart. [¶] The scientific evidence, which is what you'll be relying on, will, in fact, show that Mr. Stewart shot first and Mr. Guerrero stood his ground, literally on the ground, which he's allowed to do, and unloaded every bullet he had."

He further argued that Guerrero had an additional clip that was recovered from his uncle's house and which contained all its bullets. He asserted: "[T]he evidence will show that if Mr. Guerrero had wanted to shoot someone other than the person who shot him at any point that evening, he could have. [¶] . . . [T]here's only one person Mr. Guerrero shot, and that evidence will show that one person is Mr. Stewart. He shot him because Mr. Stewart shot nine shots at him, striking him more than once."

Before closing arguments, the court instructed the jury on self-defense with CALCRIM No. 505 and imperfect self-defense with CALCRIM No. 571. The court also instructed the jury on provocation with CALCRIM No. 522 and voluntary manslaughter with CALCRIM No. 570.

During closing argument, defense counsel argued that the evidence showed that Guerrero had fired at Stewart from the ground. He stated: "Why is he on the ground? Because he'd been shot. He had been shot and he pursued the person who shot him." He suggested that the crime was a hit on Guerrero that Stewart executed and that Guerrero "[did] what somebody has a legal right to do when they're shot, which is to chase [Stewart], who goes back to his car because he's thinking maybe he'll get away."

39

### 3.2. Applicable Law

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to ' "instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' [Citations.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 996; see also *People v. Villanueva* (2008) 169 Cal.App.4th 41, 49 ["If the defense is supported by the evidence but is inconsistent with defendant's theory of the case, the trial court should instruct on the defense only if the defendant wishes the court to do so."].) As our Supreme Court has explained, limiting the sua sponte duty to instruct in this way "is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716, overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 175.) "Evidence of a defense is sufficiently substantial to trigger a trial court's duty to instruct on it sua sponte if it is sufficient for a reasonable jury to find in favor of the defense." (*People v. Hanna* (2013) 218 Cal.App.4th 455, 462.) " '[S]peculation is not evidence, less still substantial evidence.' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 735.)

The transferred intent doctrine imposes criminal liability on a defendant who attempts to kill one person but kills someone

else by mistake or inadvertence. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 688.) In the context of self-defense cases, transferred intent may apply where the defendant intends to injure or kill the person who poses an imminent and unlawful threat of death or great bodily injury but inadvertently kills an innocent bystander. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357.)

### 3.3.   Analysis

Guerrero contends that a sua sponte transferred intent instruction was required because there is evidence to support that he intended to shoot an assailant who fired at him first but shot Stewart instead.

As the Attorney General argues, this theory is factually at odds with that advanced by Guerrero at trial. His attorney repeatedly asserted that the evidence supported the conclusion that Stewart fired at Guerrero first and Guerrero returned fire in self-defense. He dismissed the possibility that any person other than Stewart had instigated the incident and argued that Guerrero's additional clip, which contained unspent bullets, was evidence that no other person was involved. Rather, it was the prosecution's theory that a third person was involved, although its argument was that this third person fired at Guerrero from the sidewalk *after* Guerrero shot Stewart and attempted to flee the scene.

Guerrero asserts, without citation, that "[t]rue inconsistency with a defense theory arises from factual or logical impossibility." He also contends that transferred intent is not a defense, but an extension of his theories of self-defense. Thus, unlike an affirmative defense, for which instruction is "required only if it appears that the defendant was relying on the defense,

41

or that there was substantial evidence supportive of the defense, and the defense was not inconsistent with the defendant's theory of the case," he contends the instruction was required "whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine." (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

For purposes of argument, we accept that there was no "true inconsistency" between the two self-defense theories and that there was sufficient evidence to support this theory. We also accept Guerrero's assertion that transferred intent is not an independent defense such that the law described above applies. (See *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1023 (*Mathews*) [transferred intent is a doctrine that "establishes that one's criminal intent follows the corresponding criminal act to its unintended consequences" and can apply to self-defense]; *People v. Curtis*, *supra*, 30 Cal.App.4th at p. 1357 ["self-defense may . . . apply where the defendant intends to injure or kill the person who poses the threat, but inadvertently kills an innocent bystander instead"].) However, even accepting these contentions, we are not persuaded that sua sponte instruction on transferred intent is required whenever an instruction on self-defense is supported by the evidence.

In *Mathews*, the Third District concluded that the trial court had no duty to instruct the jury on transferred intent sua sponte. (*Mathews*, *supra*, 91 Cal.App.3d at pp. 1024–1025.) The defendant asserted that the instructions given precluded the jury from making a finding that she had acted in self-defense, where the defendant had shot and killed an innocent third party, rather

than the person who had threatened her.[11] (*Id.* at p. 1025.) The *Mathews* court disagreed and held that "the instruction merely advises that homicide is justified when the unlawful aggressor is the person killed. It does *not* state that homicide is *unjustified* where the unlawful aggression of one results in the inadvertent death of another." (*Ibid.*; see also *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1038–1039 [recognizing doctrine of "transferred self-defense," but concluding self-defense instructions adequately conveyed the principle].)

Here, the court gave the standard jury instructions regarding murder (CALCRIM No. 520), degrees of murder (CALCRIM No. 521); voluntary manslaughter under both heat of passion and imperfect self-defense theories (CALCRIM Nos. 570, 571); provocation (CALCRIM Nos. 522, 570) and self-defense (CALCRIM No. 505).[12] Taken as a whole, the instructions informed the jury that if Guerrero shot Stewart while trying to defend himself from another, it would either not be a crime or would be voluntary manslaughter. Neither the self-defense nor

---

[11] Specifically, the defendant relied on CALJIC No. 5.13, which stated: " 'Homicide is justifiable and not unlawful when committed by any person in the defense of herself if a reasonable person in a like situation would believe that *the person killed* intended to commit a forcible and atrocious crime and that there was imminent danger of such crime being accomplished. A person may act upon appearances whether such danger is real or merely apparent.' " (*Mathews*, *supra*, 91 Cal.App.3d at p. 1029 (dis. opn. of Reynoso, J.).)

[12] As Guerrero concedes, the bench notes for CALCRIM No. 505 acknowledge that transferred intent applies to self-defense but state: "There is no sua sponte duty to instruct on this principle, although such an instruction must be given on request when substantial evidence supports it."

43

imperfect self-defense instructions suggested that the person killed must be the aggressor. In this respect, they are less confusing than the instruction at issue in *Mathews*.

We are not persuaded that the absence of an instruction comparable to CALJIC No. 5.30 renders *Mathews* inapplicable. CALJIC No. 5.30 stated that "[i]f the right of self-defense exists, it is a complete defense to *any crime* committed during the exercise of the right." (*Mathews, supra*, 91 Cal.App.3d at p. 1025.) The self-defense instruction here stated: "The defendant is not guilty of murder if he was justified in killing *someone* in self-defense." (Italics added.)This instruction indicates that if Guerrero had been justified in killing his aggressor in his exercise of self-defense, he was likewise justified in killing someone else. Moreover, the court instructed the jury with CALCRIM No. 500, which sets forth the general principles of homicide and states: "If a person kills with a legally valid excuse or justification, the killing is lawful and he or she *has not committed a crime*." (Italics added.)

On reply, Guerrero argues that, following *People v. Schuller* (2023) 15 Cal.5th 237, a court must instruct a jury on transferred intent whenever an instruction on imperfect self-defense is warranted. In *Schuller*, the California Supreme Court granted review to decide the appropriate standard for evaluating prejudice where there was substantial evidence of imperfect self-defense but the court failed to instruct the jury on that theory. (*Id.* at p. 243.) The court concluded that such an error is subject to review under the federal *Chapman* standard and that "when there is substantial evidence to support the theory, the failure to instruct on imperfect self-defense amounts to an incomplete instruction on an actual element of murder, namely malice." (*Id.*

44

at pp. 243–244.) "Because this form of misinstruction precludes the jury from making a finding on a factual issue that is necessary to establish the element of malice, it qualifies as federal error." (*Id.* at p. 244.)

Guerrero concedes that the jury was instructed on imperfect self-defense and that *Schuller* makes no reference to transferred intent. Nevertheless, he contends that "an 'incomplete or misleading' instruction on imperfect self-defense— here, failure to instruct on transferred intent (transferred self-defense)—amounts to an incomplete or misleading description of the element of malice for murder." We disagree. In the absence of the imperfect self-defense instruction, "jurors would have no reason to conclude they cannot find malice (and thus cannot return a verdict of murder) if they harbor a reasonable doubt as to whether the defendant acted in the actual, but unreasonable, belief in the need for self-defense." (*People v. Schuller*, *supra*, 15 Cal.5th at p. 244.) Under the instructions given in this case, the jurors would have no reason to believe that they could *not* find a defendant not guilty of murder even if he shot and killed someone other than his aggressor.

Accordingly, the court's failure to sua sponte instruct the jury on transferred intent was not error. We further reject Guerrero's contentions that the instructions as given were erroneous or that counsel was ineffective for failing to request the instruction. "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a

45

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.) We have determined that the instructions permitted the jury to conclude that Guerrero either committed no crime or was guilty of voluntary manslaughter if, while acting in self-defense or imperfect self-defense, he killed the wrong person. Any possible deficiency in failing to request a transferred intent instruction did not result in the denial of Guerrero's constitutional right to the effective assistance of counsel.

## 4. Substantial evidence supports Guerrero's murder conviction.

### 4.1. Applicable Law

" ' "Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. (§ 188; [citations].) "But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable [or imperfect] self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise *inheres* in such a

46

homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation].' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549.) "If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case [citation], the *People* must prove *beyond reasonable doubt* that these circumstances were lacking in order to establish the murder element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 462.)

"A homicide is considered justified as self-defense where the defendant actually and reasonably believed the use of deadly force was necessary to defend himself from imminent threat of death or great bodily injury. Under such circumstances, the killing is not a crime." (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744.) Neither perfect nor imperfect self-defense may "be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Valencia* (2008) 43 Cal.4th 268, 288.)

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably

have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### 4.2. Analysis

Guerrero contends that there was no evidentiary basis for the jury to infer beyond a reasonable doubt that he was the initial aggressor and that perfect or imperfect self-defense did not apply. He contends first that there were no eyewitnesses. There is no requirement, however, that a crime be proven by eyewitness testimony. "The standard of review [for sufficiency of the evidence] is the same in cases such as this where the People rely primarily on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

48

Guerrero also contends that he provided the only firsthand account of the shooting to the police when they arrested him and that his statements implicated other gunmen as the initial aggressors. However, there was also testimony that, prior to his arrest, Guerrero was rambling, acting strangely, and becoming less coherent as he lost more blood. Although he stated " 'They shot me,' " he later seemed to blame Luis, Jr. for the shooting, even though there was no evidence his cousin had left the house that evening. As Guerrero concedes, the jury was under no obligation to find his statements credible.

Guerrero argues that the physical evidence does not permit an inference that he was the initial aggressor. We disagree. It is undisputed that Guerrero shot at Stewart over a dozen times and that at least eight of those bullets struck Stewart, predominantly in his side and back. No gun was recovered near Stewart's body. Rather, he appeared to have been holding a key lanyard and a bag of drugs at the time of his death. Guerrero asserts that "this merely means that someone else near Stewart was the gunman." However, the nine-millimeter casings were located some 20 feet away from Stewart's body. No bullet impacts were located in the gate or fence, near which the evidence indicates Guerrero was standing, nor were any nine-millimeter bullets located at the scene. The prosecution presented video evidence indicating that, after Stewart was shot, an individual ran to the sidewalk, near where the casings were located. Thus, while it is undisputed that Guerrero was shot, the jury could infer from the evidence that someone shot Guerrero *after* he fired at Stewart 14 times and

that Guerrero therefore did not act in self-defense or imperfect self-defense.[13]

Although Guerrero concedes that the jail calls may, in isolation, support the prosecutor's contention that Guerrero shot at Stewart first, he contends that they do not support the theory in context. (See *In re I.C.* (2018) 4 Cal.5th 869, 892 ["It is well settled that the [substantial evidence] standard is not satisfied simply by pointing to ' "isolated evidence torn from the context of the whole record." ' [Citation.]"].) However, having reviewed the jail call transcripts in their entirety, we conclude that a trier of fact could reasonably infer from the calls that Guerrero did not know whether Stewart shot him or whether he was even armed. When viewed in the context of the rest of the evidence presented to the jury, this tends to support that Guerrero did not act in self-defense when he shot Stewart.[14]

---

[13] Guerrero relies on *People v. Nelson* (2016) 1 Cal.5th 513 for the proposition that "[w]here two scenarios are both plausible but the jury has no reasonable basis to select one over the other, the chosen scenario cannot constitute substantial evidence." However, in *Nelson*, there was *no* evidence indicating that the defendant "arrived before the victims or waited in ambush for their arrival" and thus no evidence to support the lying-in-wait special circumstance. (*Id.* at pp. 551–552.) In contrast, the location of the nine-millimeter casings and the absence of any bullet impacts where Guerrero was located indicate that the shooter fired at Guerrero after Guerrero shot Stewart. We cannot conclude that " ' "an equal or nearly equal theory of guilt and a theory of innocence [was] supported by the evidence *viewed in the light most favorable to the prosecution*." ' " (*U.S. v. Flores-Rivera* (1st Cir. 1995) 56 F.3d 319, 323, italics added.)

[14] Guerrero also challenges various inferences the prosecutor asked the jury to make concerning the jail calls in his closing argument. The jury was instructed that the arguments of counsel were not evidence. We

Guerrero argues that *People v. Estrada* (1923) 60 Cal.App. 477 supports the conclusion that the evidence here is insufficient. In *Estrada*, the victim was a boarder at defendant's mother's house. (*Id.* at p. 479.) The defendant and deceased had been drinking together with friends. (*Ibid.*) They eventually parted ways with their other friends, one of whom testified that the "deceased was quarrelsome and that deceased said to defendant, 'I am going to do you up, you and your mother, too.'" (*Ibid.*) The only evidence of what occurred after this point was a written statement from the defendant made shortly after he was arrested. (*Id.* at pp. 478, 479.) According to the statement, the deceased had "started to abuse [the defendant] and wanted to fight" and made statements that led the defendant to believe "'that being he had killed my half-brother, he could kill me.'" (*Id.* at p. 480.) The deceased retrieved a knife and club and struck the defendant with the club multiple times. (*Ibid.*) When the deceased dropped the knife, the defendant picked it up and stabbed him. (*Ibid.*) An officer observed a large bruise on the defendant's chest. (*Id.* at p. 479.) The court concluded that "nothing indicated . . . that defendant, in repelling the attack of [the deceased], acted other than in necessary self-defense" and that the verdict of manslaughter was not supported by the evidence. (*Id.* at pp. 481, 483.) It further noted that the physical evidence at the scene of the killing was "wholly consistent with the story told by defendant." (*Id.* at p. 483.)

Here, there was no direct evidence to support a finding that Stewart had threatened Guerrero. Moreover, for the reasons

need not accept the prosecutor's characterization of the evidence to decide that the evidence was sufficient.

51

discussed above, the physical evidence was not wholly consistent with the conclusion that Guerrero acted in self-defense. For the same reasons, Guerrero's citations to *People v. Mercer* (1962) 210 Cal.App.2d 153 and *People v. Collins* (1961) 189 Cal.App.2d 575 are unpersuasive. These cases stand for the proposition that, if the prosecution's case depends on otherwise exonerating statements by the defendant, and there is no independent evidence of guilt, the proof is not sufficient.[15] That is not the case here.

**5.      The court did not abuse its discretion in denying the motion for mistrial where any prosecutorial misconduct was not prejudicial.**

**5.1.   Additional Background**

Prior to closing arguments, the court instructed the jury that it "must not let bias, sympathy, prejudice, or public opinion influence [its] assessment of the evidence or [its] decisions." The court also instructed the jury: "Nothing the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence."

During closing argument, the prosecutor argued: "Now this is a case about Andrew Stewart. This is his story. If he were here,

---

[15] All three cases relied on former section 1105 (repealed in 1989), which stated that if homicide by the defendant is proved, the burden is on the defendant to justify the killing " '*unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.*' " (*People v. Estrada, supra*, 60 Cal.App. at p. 482.)

this is what he would tell you that the evidence shows: 'I had my back turned to the defendant. I knew him. Took a picture with him. We had a good time. And on February 3rd, 2018, he shot and killed me. And I'm telling you, I didn't have a gun. Where's the evidence of that? Are you going to hang this case because there was some G.S.R. on my hands? There's an explanation for that. My hand had drugs and my keys. I was going to my car when that guy shot me at least eight times, shot at me 14 times, and he killed me. [¶] Now he's trying to tell you that somehow, the evidence in this case, despite its non-conformity with his behavior, non-conformity with what he said, non-conformity with the physical evidence, he's trying to say it was okay for him to do that to me because I shot at him?' "

The following trial day, Rayburn raised concerns that the prosecution "channeling" the victim to the jury was an inappropriate appeal to emotion and sympathy. He cited a case establishing that it was inappropriate for the prosecution to ask the jury to put itself in the shoes of the victim. The court interjected that it did not believe that the prosecution did that. Rayburn stated that he made a strategic decision not to object in the middle of the statement, as he was concerned that it would make him appear callous. The court replied: "I do recall the closing. I do recall that it was emotional. I do recall thinking to myself, 'Oh, gosh. I hope he's not inviting the jury to do that,' because I know the law, and he didn't." The court noted that its recollection of exactly what was stated would have been fresher on the same day. The prosecution argued that "more than 50 minutes of the hour of the closing was laying all the foundation for what . . . the circumstantial evidence shows" and that, "at the end of it, there was a pretty much reiteration of that evidence."

The court stated again that it did not feel that a line had been crossed. Rayburn moved for a mistrial. In the alternative, he asked that the jury receive an instruction that such appeals are inappropriate. The court stated that it had already instructed the jury "not to let bias, sympathy, prejudice, and a laundry list of other things . . . affect their decision" and declined the request for a mistrial or a pinpoint instruction.

### 5.2. Applicable Law

" 'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 920.) Even if the behavior does not reach that level of egregiousness, it may still violate California law if it involves the " 'use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 760.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*Hamilton*, at p. 920.)

"A claim of prosecutorial misconduct is governed by the abuse of discretion standard of review. [Citation.] 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the

54

prosecutor's statements. [Citation.]' [Citation.]" (*People v. Lima* (2022) 80 Cal.App.5th 468, 477–478; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268 ["Prosecutorial misconduct is reviewed for prejudice."].)

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Silva* (2001) 25 Cal.4th 345, 372.)

### 5.3.   Analysis[16]

Guerrero contends that the court prejudicially erred in denying his motion for a mistrial or, in the alternative, an admonition to the jury after the prosecutor committed misconduct by purporting to speak in the victim's voice to accuse Guerrero of the murder. We first consider whether the prosecutor committed misconduct and, if so, whether it was prejudicial.

Our Supreme Court has " 'settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1344.) However, it has frequently determined that such appeals are not prejudicial error. (*Ibid.*; see also *People v. Leonard* (2007) 40 Cal.4th 1370, 1407; *People v. Fields* (1983) 35 Cal.3d 329, 363.)

---

[16] We accept the Attorney General's concession that the objection to the soliloquy from Stewart's perspective was timely. (See *People v. Steskal* (2021) 11 Cal.5th 332, 360 [objections raised in a motion for mistrial the day after the prosecutor's argument were sufficient to preserve the claim even though the timing "may not have been 'ideal' "].)

Here, the prosecutor did not ask the jury to put itself in the victim's position, but instead spoke as if he were the victim. In *Drayden v. White* (9th Cir. 2000) 232 F.3d 704, the Ninth Circuit Court of Appeals concluded that the prosecutor had erred in delivering a soliloquy from the victim's perspective in his closing argument while sitting in the witness chair. (*Id.* at pp. 711, 713.) The court stated that the soliloquy "seriously risked manipulating and misstating the evidence by creating a fictitious character based on the dead victim and by 'testifying' in the voice of the character as if he had been a percipient witness." (*Id.* at p. 713.) However, the Ninth Circuit concluded that this error did not deny the defendant due process or render the trial fundamentally unfair because "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence." (*Ibid.*) The court had also instructed the jury that statements made by attorneys during closing argument are not evidence and that the jury must not be influenced by sentiment or sympathy, instructions it presumed the jury followed. (*Ibid.*)[17] Similarly, in *Allen v. Woodford* (9th

[17] In *People v. Manyik* (Colo.Ct.App. 2016) 383 P.3d 77, 85–86, which Guerrero cites, the court similarly concluded that channeling the victim was misconduct but not prejudicial. Here, as in *Manyik*, "while the narrative as a whole was calculated to appeal to the jurors' emotions, the prosecutor did not dwell on details that would have aroused the strongest emotional responses, such as the pain and suffering the victim experienced after he was shot and the family and friends he left behind." (*Id.* at p. 85.) Moreover, "although a limiting instruction by the trial court generally is not sufficient in itself to ensure that misconduct of the type at issue here does not substantially affect the verdict, it is relevant to our analysis that before opening statements, the trial court instructed the jury that 'what the lawyers say is not evidence and you cannot consider what the lawyers say for

Cir. 2005) 395 F.3d 979, 997, the Ninth Circuit concluded that the prosecutor's description of what the defendant's "victims would say from beyond the grave did not deny [the defendant] due process because it was intended to summarize the evidence presented."

The prosecutor's soliloquy here was brief when compared to that in *Drayden* and did not make any assertions as to what the victim thought or felt when he died, as did the soliloquy in that case. As in *Drayden* and *Allen*, the discussion largely summarized the evidence presented to the jury and was preceded by an instruction that the arguments of attorneys were not evidence and that it must not be influenced by sentiment or sympathy. Even if we assume that the prosecutor erred in making this argument, we conclude, as did the courts in *Drayden* and *Allen*, that any error did not render the trial fundamentally unfair and was not prejudicial.

Guerrero also argues that the prosecutor "preemptively shame[d] jurors not to bring up the important GSR evidence" in his closing argument and that this was improper, citing *People v. Sanchez* (2014) 228 Cal.App.4th 1517. However, in *Sanchez*, the prosecutor "argued that defendant hopes that 'one of you' will be 'gullible enough,' 'naïve enough,' and 'hoodwinked' by the defense arguments so that he 'can go home and have a good laugh at your expense.' " (*Id.* at p. 1529.) The prosecutor repeated the phrase " 'one of you' " 10 times, and the court of appeal concluded that

---

any purpose.' . . . [T]he fact that the jury acquitted Manyik of the most serious charge—first degree murder—indicates that the jurors based their verdict on the evidence presented and were not swayed by the prosecutor's inflammatory appeal to their sympathy for the victim." (*Id.* at pp. 85–86.)

this repetition was "directed at any juror who might consider being a lone holdout for acquittal" and "planted the idea that anyone who accepted the defense attorney's 'ridiculous arguments' would be a sucker who could be easily manipulated, or 'hoodwinked.'" (*Id.* at p. 1531.)

Here, the prosecutor asked the jury not to conclude that Stewart shot at Guerrero because of GSR on his hands. The prosecutor did not use "one of you" language that would tend to isolate a dissenting juror, nor did the prosecutor state that a holdout juror would be gullible or naïve if it considered the GSR evidence meaningful. Although the prosecutor's argument was forceful, we conclude that the comments were not "designed to offend and intimidate the potential holdout juror who doubted defendant's guilt." (*People v. Sanchez, supra*, 228 Cal.App.4th at p. 1530.)

Having concluded that the error was not prejudicial, we also conclude that the court did not abuse its discretion in concluding that Guerrero's chance of receiving a fair trial was not "irreparably damaged" and that a mistrial was not warranted. (*People v. Silva, supra*, 25 Cal.4th at p. 372.)[18]

6. **The court did not abuse its discretion in admitting the jail calls.**

   6.1.  **Additional Background**

Before the jail calls were introduced as evidence at trial, the court heard argument from counsel as to whether they were

---

[18] To the extent that Guerrero contends that the court's failure to take corrective action was erroneous even if the prosecutorial misconduct was not prejudicial, he cites no support for this proposition and thus forfeits it.

admissible. Rayburn argued that the references in the calls to something Guerrero had been told rendered the statements hearsay. The court observed that Guerrero had adopted the statements as his own, as indicated by such statements as, " 'It looks good, dog. It doesn't look too bad for me and shit.' " The court also stated that, to the extent the statements came from his counsel, Guerrero had waived the privilege, as there were constant audio reminders that the calls were being recorded. The prosecutor argued: "What matters . . . is how he's responding to his adopted knowledge of this information, whomever told it to him. In this case, there is no prejudicial effect that substantially outweighs the probative value, in that the privilege of attorney-client privilege has been waived." The court concluded that "every other hurdle" besides relevance under Evidence Code section 352 had been overcome.

The court concluded that the relevance outweighed the possible prejudice. It explained: "It was relevant to essentially give a peek into the thought process that Mr. Guerrero was going through when being told what certain things were, what they could mean, feeling very positive, like, 'Hey, this could mean manslaughter for me.' [¶] The most telling part, I always said from the beginning, was the fact that he indicated on two separate calls he didn't know if the dead guy had a gun. That was very, very critically important information to get into his state of mind, so that's why this line of questioning came in."

During closing argument, the prosecutor noted that Guerrero questioned whether Stewart had a gun and stated " '[i]f the guy had a gun' " and asserted that this evidence "shows he shot an unarmed individual." He further argued: "He's okay with manslaughter. This is good news. 'It's looking like manslaughter.'

That is not the behavior of somebody who knows that he killed because it was either kill or be killed, 'I had to do this.' There's no righteous indignation in his voice. 'If I didn't do this, I was going to die, and why isn't the law vindicating me?' "

### 6.2. Applicable Law

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) " ' "Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " ' [Citation.]" (*People v. Lopez* (2021) 65 Cal.App.5th 484, 504.) However, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.]" (*People v. Jones* (2017) 3 Cal.5th 583, 610.)

Pursuant to Evidence Code section 1200, out-of-court statements are inadmissible when offered to prove the truth of the matter stated, with specified exceptions. Evidence Code sections 1250 and 1252 provide for admissibility of trustworthy statements offered to prove the state of mind of the declarant at the time that the statement was made (*id*., § 1250, subd. (a)(1)) or to prove or explain acts or conduct of the declarant (*id*., subd. (a)(2)).

60

The abuse of discretion standard "is proper when, as here, the determination under attack concerns the admissibility of evidence." (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [abuse of discretion standard is appropriate for questions of relevance, state-of-mind hearsay exception, and undue prejudice].) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" ' [Citation.]" (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.)

" '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, superseded by statute on other grounds as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### 6.3.   Analysis

The court admitted the jail call transcripts on the grounds that they reflected Guerrero's state of mind. Guerrero contends that the calls were irrelevant or that the relevance of the statements was outweighed by substantial prejudice.

Guerrero first argues that his statements concerning a manslaughter conviction revealed only "what his lawyer was telling him about his prospects at trial" and "that he realized he might be spared an unfair conviction for first-degree murder." This is one possible interpretation. A trier of fact could infer that someone who genuinely believed, reasonably or not, that he had

taken actions necessary to defend his own life may not think circumstances were "looking good" where a manslaughter conviction was likely. A jury could also reasonably infer that Guerrero's statements indicate ignorance of whether Stewart was armed and thus call into question whether Guerrero acted in self-defense. A person who honestly believed he had taken necessary steps to protect his life might be expected to know whether the person he shot and killed was armed. Guerrero argues that his knowledge of whether Stewart had a gun is irrelevant, as he could have acted in self-defense or imperfect self-defense regardless of whether Stewart was armed. However, in his opening argument, Guerrero's counsel argued that Stewart was the person who shot Guerrero and that, had someone else been present, Guerrero could have shot them. The prosecution was entitled to introduce evidence to discredit this theory.[19] The court's determination that these statements were relevant was not patently absurd.

---

[19] *People v. Kaurish* (1990) 52 Cal.3d 648, a decision cited by Guerrero, supports this point. In *Kaurish*, the prosecution asked a prison expert questions about the possibility of escape from prison during the penalty phase of a capital trial. Our high court concluded that "[s]uch testimony is inherently speculative, and may be highly prejudicial in undermining juror confidence in the sentence of life imprisonment without parole as an alternative to death." (*Id.* at p. 710.) However, the Supreme Court concluded that no misconduct occurred so long as the prosecutor limited himself to challenging defense counsel's suggestion to the jury that it should consider the impossibility of escape as a mitigating factor. (*Id.* at pp. 710–711.) Evidence suggesting that Guerrero did not know whether Stewart was armed was responsive to arguments made by Guerrero.

*State v. Stewart* (Mo.App. 1976) 542 S.W.2d 533, 537 does not support Guerrero's contention that the jail calls were irrelevant and thus improperly admitted. In *Stewart*, the court ruled that the admission of the defendant's statement "that he knew he was charged with possession of marihuana" did *not* constitute error. (*Ibid.*) Moreover, a defendant's statement to family or friends that he may at worst be convicted of manslaughter, in a manner that may be described as positive, is different in nature to a mere acknowledgment to a police officer of the charges the defendant is facing. *United States v. Rittweger* (2d Cir. 2008) 274 Fed.Appx. 78, 82, held only that the court did not abuse its "broad discretion" in *excluding* statements from one member of a conspiracy to another exhorting that the coconspirator should " 'tell the truth' and 'listen to [his] attorney,' " which the court concluded were of marginal relevance. Those statements are far more neutral than those made by Guerrero during the jail calls. Finally, Guerrero cites *Roberts v. City of Troy* (6th Cir. 1985) 773 F.2d 720 for the proposition that he "could not be expected to understand the legal elements of self-defense, much less the confusing doctrine of imperfect self-defense." However, the portion of the opinion on which Guerrero relies considered whether a statement was properly admitted under the federal statement against interest hearsay exception where the declarant did not know that the statement was unfavorable under relevant state regulations. (*Id.* at pp. 725–726.) It did not analyze whether the at-issue statement was relevant. In addition to being distinguishable on their facts, all three decisions are also persuasive authority only.

We therefore consider whether the court abused its discretion in holding that the relevance of the statements was

outweighed by substantial danger of undue prejudice. (Evid. Code, § 352.) Guerrero contends that the evidence was prejudicial because "[l]ay jurors could not be expected to carefully distinguish between what a defendant actually did or thought and what his lawyer believed he could prove to a jury (or raise a reasonable doubt) under the strict courtroom rules of evidence." Although framed as an argument concerning prejudice, this appears to be a contention that the jail calls reflect only what third parties (presumably his attorney or persons from the public defender's office) told him, rather than his state of mind. However, Guerrero does not argue that the court erred in ruling that the statements were admissible under the state of mind hearsay exception. (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 [declining to address issue not properly raised in appellant's opening brief]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 [arguments that are not adequately developed are forfeited].) In any event, we believe the trier of fact could discern between what third parties told Guerrero and statements reflecting his personal thoughts and feelings about that information. For example, although Guerrero's statements that he was "chilling out" and "Shit fucking, it looks good, dog. It doesn't look too bad for me and shit" might be based on what he learned from a third party, they provide insight into his feelings about potential convictions in light of his understanding of what occurred on February 3, 2018. The Attorney General's concession that the calls were "but one piece of evidence regarding appellant's claim of self-defense" is not an admission that they were devoid of any relevance. Considering there were no percipient witnesses and the jury had to rely primarily on

64

forensic evidence to determine what occurred, any insight into Guerrero's state of mind could be insightful to the trier of fact.

Guerrero contends that "jurors could hardly avoid being emotionally biased against someone who, in their confused and mistaken interpretation, believed that Guerrero had just admitted his guilt." However, even accepting the inferences urged by the prosecution and Attorney General, nothing in the jail calls rises to the level of an admission of guilt. The calls are merely corroborative of the physical evidence indicating that Stewart was not armed.[20] The jury was instructed that, before it could rely on circumstantial evidence to find Guerrero guilty of murder, it must be convinced that guilt is the only reasonable conclusion supported by the circumstantial evidence. To the extent there was any doubt in the jury's mind about the import of the statements, it was required to conclude that they were not indicative of his guilt for murder. The court's conclusion that the relevance of the evidence was not substantially outweighed by the risk of undue prejudice, of confusing the issues, or of misleading the jury was not patently absurd. Thus, we do not reach Guerrero's contention that the admission of the evidence was a violation of his federal due process rights.

---

[20] The calls also contain statements that could support Guerrero's contention that he was not the initial aggressor. Guerrero expressed a belief that he shot "from the front" by the shotgun. He stated that a nine-millimeter bullet had been removed from his nose and that he believed "it went through, like, cars or something." His belief that he was shot multiple times in the front of his body is inconsistent with the prosecutor's claim that he was only shot while fleeing after shooting Stewart.

**7.    The court did not abuse its discretion in declining to dismiss the firearm enhancement.**

### 7.1.    Additional Background

Sentencing took place on November 1, 2022. The court received a written sentencing memorandum from the prosecution while defense counsel relied on oral argument. Rayburn asked that the court dismiss any special allegations and strikes that were within its discretion to strike. He also noted that Guerrero was in a form of protective custody because he had been "green-lighted."[21] Rayburn argued that this protective custody caused him to be segregated "in a way that is . . . a very difficult existence, much more so than simply being in prison." He also argued that the section 12022.53, subdivision (d) enhancement would add a sentence equivalent to an independent murder and identified it as an area in which the court might exercise its discretion.

The district attorney noted that the court must engage in a section 1385 analysis before exercising its discretion to strike any special allegations or strikes. He noted that Guerrero had five prior gun convictions, including one for which he was on parole at the time of the shooting, and emphasized the number of gunshots fired by Guerrero during the crime as "aggravating factors in this case for not striking any of the allegations or prior strikes and enhancements."

The court acknowledged that it had discretion to strike the section 12022.53, subdivision (d) and section 667, subdivision (a)

---

[21] A green-light "is authorization from authority figures in [a] gang to kill that person." (*People v. Parrish* (2007) 152 Cal.App.4th 263, 278.)

66

enhancements. It expressed that it did not believe the exercise of that discretion would be appropriate with respect to the gun enhancement in this case since Stewart was shot "upwards of eight times" by the gun found on Guerrero. The court stated: "I cannot see why, in this particular case, the interests of justice would be served in not acknowledging that this was the use of a gun that struck someone several times and caused that person's death." Nevertheless, it acknowledged that "[w]e are trying, as a society, to not just over-incarcerate people" and stated that it "did not see a point in adding the five-year prior."

For count 2, the court sentenced Guerrero to one-third the midterm, or eight months, which was doubled pursuant to sections 667, subdivisions (b) through (i), and 1170.12, subdivisions (a) through (e), for an additional 16 months, resulting in a total of 16 months in state prison, plus 40 years to life.

### 7.2. Applicable Law

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to add mitigating factors the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (Stats. 2021, ch. 721, § 1.) Section 1385, subdivision (c), states as follows: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing

the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." Subdivision (c)(2)(B) provides that, if "[m]ultiple enhancements are alleged in a single case . . . all enhancements beyond a single enhancement shall be dismissed." Subdivision (c)(2)(C) provides that, if "[t]he application of an enhancement could result in a sentence of over 20 years . . . the enhancement shall be dismissed."

In general, we review a trial court's decision not to strike a sentence enhancement under section 1385 for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 371; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 298 (*Mendoza*).) The abuse of discretion standard is highly deferential. (*Mendoza*, at p. 298.) When, " ' "as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid*.)

However, "[w]e independently review questions of statutory interpretation." (*Mendoza*, *supra*, 88 Cal.App.5th at p. 294.) Recently published decisions have examined the language and legislative history of section 1385, subdivision (c)(2)(B) and (C,) and have held "that dismissal is not always required when a mitigating factor that contains 'shall be dismissed' language applies." (*Mendoza*, at p. 297, citing *People v. Walker* (2022) 86 Cal.App.5th 386, 391, review granted Mar. 22, 2023, S278309; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15; and *People v. Anderson* (2023) 88 Cal.App.5th 233, 239–241, review granted Apr. 19, 2023, S278786; see also *People v. Mazur* (2023) 97 Cal.App.5th 438, 444 [adopting the reasoning set forth in

*Mendoza*, *Anderson*, *Lipscomb* and *Walker*].) The *Mendoza* court reasoned that section 1385, subdivision (c)(2) "means that if the court finds that dismissal of an enhancement 'would endanger public safety,' then the court need not consider the listed mitigating circumstances." (*Mendoza*, at p. 296.) Thus, "[t]he 'shall be dismissed' language in section 1385(c)(2)(C), like the language of all of the listed mitigating circumstances, applies only if the court does not find that dismissal of the enhancement would endanger public safety. That interpretation gives meaning to the language in section 1385(c)(2) requiring the court to consider whether dismissal 'would endanger public safety,' and it consequently avoids rendering that language surplusage." (*Ibid.*) In contrast, the defendant's contention that dismissal was mandatory when one of the mitigating factors was present "gives no effect to the clause 'unless the court finds that dismissal of the enhancement would endanger public safety[]' (§ 1385(c)(2)[])" and would "require a court to dismiss any enhancement when application of the enhancement could result in a sentence greater than 20 years *regardless of whether dismissal would endanger public safety*." (*Ibid.*) The *Walker* court reasoned: "If we were to read the phrase appended to the multiple enhancements mitigating factor as *automatically* mandating dismissal of all but one enhancement whenever multiple enhancements exist, then the existence of multiple enhancements would not 'weigh greatly' in favor of dismissal—it would weigh *dispositively*. But that is not what the statute says, and we are not allowed to rewrite the statute." (*Walker*, at p. 397.)

Reported decisions have also uniformly concluded that section 1385, subdivision (c) does not apply to strikes under the Three Strikes law. Subdivision (c) of section 1385 expressly

69

applies to the dismissal of an "enhancement." (§ 1385, subd. (c)(1).) In *People v. Burke* (2023) 89 Cal.App.5th 237, 243, the court explained: " 'Ordinarily words used in a statute are presumed to be used in accordance with their established legal or technical meaning.' [Citation.] The term 'enhancement' has a well-established technical meaning in California law. [Citation.] 'A sentence enhancement is "an additional term of imprisonment added to the base term." ' [Citations.] It is equally well established that the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense." Because "[t]he plain language of subdivision (c) of section 1385 applies only to an 'enhancement,' and the Three Strikes law is not an enhancement," the *Burke* court concluded that section 1385, subdivision (c)'s provisions regarding enhancements do not apply to the Three Strikes law. (*Burke*, at p. 244.)

In *People v. Olay* (2023) 98 Cal.App.5th 60, 67, the court acknowledged a wrinkle in this analysis: the language of section 1385, subdivision (c)(2)(G) — which the *Burke* court did not consider — states that a " 'criminal conviction[] [or] *juvenile adjudication*[] that trigger[s] the enhancement or enhancements applied in the current case' is a mitigating circumstance to which a trial court must 'afford great weight' in deciding whether to dismiss an 'enhancement.' " The defendant argued that there are no enhancements triggered by juvenile adjudications and thus the term enhancement cannot be given its ordinary meaning. (*Id.* at p. 66) The *Olay* court nevertheless "agree[d] with *Burke*'s ultimate conclusion—that section 1385, subdivision (c) does not apply to the Three Strikes law," as it was "skeptical the Legislature would have expressed an intent to reject the well-established legal meaning of 'enhancement' in such a roundabout

70

manner by obliquely referencing 'juvenile adjudications' as one of the relevant mitigating circumstances." (*Id.* at p. 67) It also concluded that "[t]he legislative history confirms the Legislature had no such intent. [Citation.] The June 2021 bill analysis of SB 81 by the Assembly Committee on Public Safety distinguished an 'enhancement' from 'an alternative penalty scheme' like the Three Strikes law. [Citations.] After making that distinction, the bill analysis states, in no uncertain terms, that '[t]he presumption created by this bill applies to enhancements [ ] *but does not encompass alternative penalty schemes*.' [Citation.]" (*Ibid.*) The court also reasoned that "[i]f . . . the Legislature intended to depart from existing law by adopting a more expansive understanding of [enhancement], presumably, the legislative history would have expressed this intent far less obliquely." (*Id.* at p. 69.)

In *People v. McDowell* (2024) 99 Cal.App.5th 1147, 1155, the court similarly concluded that a defendant's "proposed interpretation [of section 1385, subdivision (c)]—reading 'enhancement' to mean any statutory mechanism that provides for a harsher sentence—is at odds with the term's established legal meaning."

### 7.3. Analysis

Guerrero contends that, because the base sentence was in excess of twenty years, the court lacked discretion under section 1385, subdivision (c)(2)(C) to apply the firearm enhancement. Every published opinion on this issue agrees that, despite the "shall be dismissed" language of section 1385, subdivision (c)(2)(B) and (C), the trial court retains discretion over the decision to strike enhancements at sentencing. We are persuaded that, despite the inclusion of the word "shall," section 1385

contains language that demonstrates that the trial court retains discretion when evaluating a request such that dismissal is not mandatory. Specifically, subdivision (c)(2) states that the presence of one or more of the enumerated mitigating circumstances weighs greatly in favor of dismissal "unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) Guerrero acknowledges this authority but fails to meaningfully address the reasoning of these cases. Absent further instruction from our high court, we decline to break with the great weight of authority.

Guerrero also contends that the court lacked discretion to apply the firearm enhancement under section 1385, subdivision (c)(2)(B) because it was already imposing a second-strike sentence. We find the reasoning in *People v. Olay, supra*, 98 Cal.App.5th 60 to be persuasive and conclude that an alternate penalty scheme such as the Three Strikes law does not constitute an enhancement.

Finally, Guerrero argues that, even if the court had discretion to impose the enhancement, it abused its discretion in failing to dismiss or reduce it. He contends that the court relied on facts that were prerequisites for the firearm enhancement and that there was no basis for the court to conclude that dismissal of the enhancement would endanger public safety, i.e., "there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).

We acknowledge, even that without the firearm enhancement, Guerrero faces a sentence of 30 years to life for the murder conviction and thus would be over 65 years old when first eligible for parole. (See *People v. Williams* (2018) 19 Cal.App.5th

72

1057, 1063 ["A defendant who would obtain immediate release . . . poses a different potential danger to society than a defendant who could be released only in his or her 70's"].) However, even if we were not required to presume that the trial court knew and followed the law — and we are (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042) — Guerrero concedes that "both the defense and the prosecutor specifically referred to the new law expanding the court's discretion [citation], and the trial court itself was particularly scrupulous in making sure that the appellate record showed that although 'the law keeps changing every day,' it carefully informed itself and was satisfied that it 'understood what my discretion is and what my discretion is not.' " The record does not affirmatively demonstrate that the trial court failed to consider the danger Guerrero might pose to the community at the time of his potential release on parole if the enhancement were stricken. (See *People v. Brugman* (2021) 62 Cal.App.5th 608, 637 [when declining to strike a sentence enhancement, a court " 'is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary' "].) Thus, we presume that the trial court considered this factor and conclude that Guerrero has failed to show error with respect to section 1385, subdivision (c).

8.    **An amended abstract of judgment should be prepared, reflecting that the section 667, subdivision (a) enhancement was stricken.**

The Attorney General argues that the court's claim that it was staying the section 667, subdivision (a)(1) enhancement was incorrect. "The trial court has no authority to stay an enhancement, rather than strike it—not, at least, when the only basis for doing either is its own discretionary sense of justice."

73

(*People v. Lopez* (2004) 119 Cal.App.4th 355, 364.) Guerrero concurs, as do we.

Accordingly, we modify the judgment to reflect that the section 667, subdivision (a)(1) enhancement was stricken. The clerk of the superior court is directed to amend the abstract of judgment to reflect the modification and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

## DISPOSITION

The section 667, subdivision (a)(1) enhancement is stricken. As modified, the judgment is affirmed. The clerk of the superior court is directed to amend the abstract of judgment to reflect the modification and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

ADAMS, J.